**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTON NO. 13-156-DLB-CJS

DANIEL SCHULTZ                                                                                   PLAINTIFF

vs.                                    <u>MEMORANDUM OPINION AND ORDER</u>

THE PNC FINANCIAL SERVICES                                                      DEFENDANT
GROUP, INC. AND AFFILIATES
LONG-TERM DISABILITY PLAN

********************

## I. Introduction

Plaintiff Daniel Schultz (hereinafter "Schultz") filed this action against Defendant PNC Financial Services Group, Inc. and Affiliates Long-Term Disability Plan (hereinafter "LTD Plan") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1001-1461. Schultz seeks review of the plan administrator's decision to deny his claim for long term disability benefits stemming from a back injury sustained in March 2012. The parties have filed cross-motions for judgment on the administrative record (Docs. # 22 and 23), which are now fully briefed and ripe for the Court's review (Docs. # 24 and 25). For reasons set forth herein, Plaintiff Schultz's Motion for Judgment on the Administrative Record (Doc. # 23) is **granted** and Defendant LTD Plan's Motion for Judgment on the Administrative Record (Doc. # 22) is **denied**.

## II. Factual and Procedural Background

Schultz has worked for PNC Financial Services Group (hereinafter "PNC") as a

Special Assets Manager (hereinafter "SA") II since December 8, 2003. (AR 8). This position not only "requir[es] broad real estate experience to implement effective workout strategies for PNC sponsored loans and investments in [m]ultifamily real estate," it "contemplate[s] training and directing asset management and underwriting staff to effectively implement the resolution strategies proposed by the special assets department." (AR 10). While the SA position is "generally a desk job," travel is "an important and critical aspect." (AR 128). An SA manages a portfolio of 10 to 12 properties throughout the country, which they must visit on a quarterly basis. (*Id.*). Accordingly, an SA "is expected to travel several times per month, which requires carrying bags, walking, driving and air travel." (*Id.*).

As a PNC employee, Schultz participated in the LTD Plan, which "provides 60% coverage [or 70% if you elect additional LTD coverage][1] of your pre-disability eligible compensation if an approved total disability, due to injury or illness occurring on or off the job, keeps [an employee] out of work beyond 91 consecutive calendar days." (AR 183). Under the terms of the Plan, an employee is considered disabled if a "disability makes [him or her] unable to perform the material or essential duties of [his or her] occupation as it is normally performed in the national economy." (AR 184). The claims administrator is responsible for determining whether an employee's disability meets this definition. (*Id.*).

The Plan provides that "LTD benefits may be less than expected, not paid at all, or stopped" if the employee no longer meets the definition of disabled. (AR 192). Failure to satisfy certain Plan requirements, submit proof of disability upon request and cooperate in

_____

1 Records reflect that Schultz elected to purchase 70% LTD coverage. (AR 7).

the administration of the claim may also result in reduction or denial of benefits. (*Id.*).

Additionally, the Plan may penalize an employee for "refus[ing] any appropriate, available treatment or fail[ing] to comply with [his or her] treatment plan." (*Id.*). The term "treatment" includes "consulting, receiving care or services provided by or under the direction of a physician including diagnostic measures." (*Id.*).

The LTD Plan is completely self-funded by means of a Group Benefits Trust (hereinafter "GBT") "established by PNC solely for the purpose of providing benefits." (AR 261). PNC then makes fixed, periodic cash contributions to the GBT "based on calculations and projections of its future long term disability liability performed by an independent actuary." (*Id.*). While the GBT's trustee, Pittsburgh National Bank, has "no duty to determine or collect any contributions by [PNC] as to the Plan," it is "solely accountable for monies or properties actually received by it." (AR 227). GBT funds are used to pay long-term disability benefits owed under the terms of the Plan. (AR 261).

Neither PNC nor Pittsburgh National Bank furnishes administrative services in connection with the LTD Plan. (AR 202-223, 228). Pursuant to an Administrative Services Only Agreement (hereinafter "Agreement"), Liberty Life Assurance Company of Boston (hereinafter "Liberty") assumed responsibility for the operation and administration of the LTD Plan. (AR 214). As the plan administrator, Liberty has the "exclusive discretionary authority to determine eligibility for benefits under the Plan, to construe the terms of the Plan and to determine any question which may arise in connection with its operation or administration, except to the extent that the Plan Administrator has authorized the claims administrator to make such determinations." (AR 196). The plan administrator's decisions are "conclusive and binding" upon employer, participating employee and survivors or

assignees thereof. (*Id.*). However, employees retain the right to file a written appeal in accordance with the LTD Plan's procedures. (*Id.*).

In March 2012, Schultz injured his back while moving a televison set in the driveway of his home in Fort Thomas, Kentucky. (AR 34). His pain worsened over the next few days, prompting him to visit his chiropractor.[2] (AR 38, 76). When these treatments provided only temporary pain relief, Schultz made an appointment with his family physician, Dr. John Redden (hereinafter "Dr. Redden"). (AR 76). On April 17, 2012, Dr. Redden diagnosed him with thoracic/lumbar pain and referred him to St. Elizabeth Healthcare (hereinafter "St. Elizabeth") for physical therapy. (*Id.*). During his physical therapy evaluation, Schultz explained that his pain increased "[s]everely when sitting over half hour; begins to increase slightly when standing over half hour," thus preventing him from traveling for work or sitting at his desk. (*Id.*). The physical therapist gave Schultz a Home Exercise Plan (hereinafter "HEP") and scheduled sessions twice a week for six weeks. (*Id.*).

On April 20, 2012, Schultz stopped going to work. (AR 15). He began receiving short-term disability benefits (hereinafter "STD benefits") three days later. (AR 21). Under the LTD Plan, STD benefits are payable for a maximum period of 91 consecutive calendar days. (AR 183). If an employee's disability extends beyond this 91 day period, referred to as the LTD Elimination Period, he or she may be eligible to receive LTD benefits. (*Id.*). However, payment of STD benefits does not guarantee that an employee will also be entitled to LTD benefits because each type of benefit has different requirements. (*Id.*).

---

2 While the Claimant Information form and St. Elizabeth treatment notes reference Schultz's visits to a chiropractor in Fort Thomas named Dr. Henderson, the record does not include treatment notes from these appointments.

At his first physical therapy session, Schultz did not have "specific point tenderness along [his] spine," but experienced "increased pain with palpation of thoracic musculature around spine" and was "unable to tolerate repeated flexion/extension." (AR 80). The physical therapist noted that Schultz "would benefit from further imaging (likely MRI) to allow for more specified diagnosis/treatment plan prior to continuation of physical therapy at this time." (*Id.*). The next day, Schultz returned to Dr. Redden's office for a follow-up. (AR 84). Dr. Redden referred Schultz to St. Elizabeth for x-rays of his lumbar and thoracic spine. (AR 72-74). The lumbar x-ray revealed "[m]ild degenerative change with spurring," as well as "[m]ild to moderate narrowing of L5-S1 interspace." (AR 73). The thoracic x-ray showed "[n]o fracture or other significant abnormality." (AR 74).

After the follow up, Dr. Redden completed an Attending Physician's Statement of Work Capacity and Impairment, which he then submitted PNC. (AR 82). In this Statement, Dr. Redden reported that Schultz was unable to travel, sit or stand for extended periods of time due to back pain and sciatica. (AR 82). As a result, he considered Schultz to be totally impaired from working as of April 17, 2012, although he anticipated improvement in Schultz's condition by the beginning of June. (AR 81-83). Dr. Redden did not believe that temporary work restrictions or accommodations would allow Schultz to return to work. (AR 83).

Schultz continued to attend physical therapy sessions at St. Elizabeth throughout the month of May. (AR 86). By June 1, 2012, Schultz demonstrated independence with his HEP and reported subjective improvement in his condition. (AR 85). However, the physical therapist noted that he was progressing quite slowly towards his goals and that "[h]ypomobility is definitely present in thoracic spine which improves after manual therapy."

5

(AR 86). While the manual therapy temporarily soothed Schultz, he reported being very sore the next two days. (AR 92). He returned to Dr. Redden, who in turn referred him to Dr. Raj Kakarlapudi (hereinafter "Dr. Kakarlapudi") at Commonwealth Orthopaedic Centers. (AR 92).

Because the manual therapy caused so much soreness, Schultz did not return to physical therapy for a month. (AR 93). When he finally returned for a follow-up, he stated that "he feels he has been worse since stopping therapy." (*Id.*). He also reported having "two significant episodes resulting in increased back pain" since his last session. (*Id.*). Noting that Schultz had "a very complicated course of physical therapy with subjective improvement but no objective improvement," marked by his recent regression, the physical therapist concluded that "therapy does not appear to be beneficial." (*Id.*). The physical therapist further indicated that Schultz "may benefit from additional imaging as his pain has not been reduced over the period of a couple months." (*Id.*). Accordingly, she instructed Schultz to meet with his physician, then call St. Elizabeth to let them know "if his physician wants further PT or not." (AR 92, 99).

Three days later, Dr. Kakarlapudi ordered an MRI of Schultz's thoracic spine. (AR 97). It revealed no fractures, mal-alignments or diffuse marrow abnormalities. (*Id.*). While "[g]entle spondylosis is seen through the mid and lower thoracic spine[, t]he gross capacity [ ] of the central canal and foramina is maintained at all levels." (*Id.*). However, the MRI showed "an atypical cyst arising from the superior pole of the left kidney," which warranted a dedicated ultrasound. (*Id.*). Although this ultrasound, performed on July 5, 2012, revealed simple renal cysts with probable prostate enlargement, the reviewing physician concluded that it was normal overall. (AR 98).

Another month passed without any physical therapy sessions. (AR 99). Schultz never contacted St. Elizabeth to tell them whether or not his physician wanted him to attend more physical therapy sessions. (*Id.*). Based on his inconsistent attendance and lack of communication, St. Elizabeth discharged Schultz on July 17, 2012. (*Id.*). The Discharge Summary noted that Schultz had only achieved one of his five physical therapy goals (to be independent with HEP). (AR 100).

As Schultz's LTD Elimination Period came to a close, Liberty notified Schultz that it would be "reviewing [his] claim for consideration under PNC Financial Services Group's Long Term Disability Policy." (AR 16, 21). Accordingly, Liberty asked Schultz to complete and submit several disability claim forms, obtain a statement from his attending physician and arrange for disclosure of his medical records. (*Id.*). After noting that the terms of the LTD Plan required Schultz to submit these documents before August 18, 2012, Liberty asked Schultz to make the necessary arrangements before July 22, 2012. (*Id.*). After all, Liberty would not be able to make a claim determination until it received proof of disability and all other required forms, nor would it be able to issue benefits during the investigation period. (*Id.*).

Despite this request, Schultz did not submit the required disability claim forms or attending physician's statement until August 17, 2012. (AR 33-42). However, Schultz did not send Liberty any medical records, so Liberty had to contact both Schultz and his physicians to arrange for disclosure of the necessary information. (AR 54). Once Schultz completed the necessary authorization and release forms, both physicians sent their records to Liberty. (AR 49-79). With the requested records in hand, Liberty began investigating and evaluating Schultz's LTD claim. (AR 54).

Meanwhile, Schultz reported to St. Elizabeth for another physical therapy evaluation in early August, this time at Dr. Kakarlapudi's request. (AR 119). After his first session, the physical therapist stated that it was "obvious that [Schultz] had not been performing his old HEP as he should be." (AR 122). The physical therapist gave Schultz an updated HEP, as well as "strengthening activities with no increase in pain, but cues for proper technique." (*Id.*). At his next session, Schultz indicated that he experienced a brief flare-up while moving over the weekend, but had not had any other issues. (AR 123). He stated that he was doing his exercises "at least every other day." (*Id.*). After reminding him of the importance of continuing his HEP, the physical therapist noted that Schultz was "progressing well, but very slow." (*Id.*). Liberty received treatment notes from Schultz's second evaluation, as well as the following physical therapy session, in early September. (AR 132).

On September 12, 2012, Liberty enlisted Dr. Neil Sherman (hereinafter "Dr. Sherman"), an independent physician, to act as a medical consultant on Schultz's claim. (AR 131-134). In addition to reviewing Schultz's medical records, Dr. Sherman discussed Schultz's condition with Dr. Redden and Dr. Kakarlapudi. (AR 132). Dr. Redden reported commented "that Mr. Schultz does consider himself 'in his own mind' to be unable to return to work.'" (AR 133). After noting that Schultz did not appear for a follow-up appointment on September 11, 2012, Dr. Redden explained that his condition "was being followed primarily by his orthopedic surgeon," whom Dr. Redden considered "to be more qualified to determine the patient's potential level of activity based on his training." (*Id.*). However, Dr. Kakarlapudi "reported that he has not seen or spoken with the patient since his last office visit on June 29, 2012," and therefore, "has no knowledge of [Schultz's] current

8

medical condition." (*Id.*). He stated that "he would need to re-examine the patient and order a Functional Capacity Evaluation to determine Mr. Schultz's present ability to return to work." (*Id.*).

Based on these conversations, considered in conjunction with Schultz's medical records, Dr. Sherman drew the following conclusions:

> The medical documentation as a whole does not demonstrate a physical impairment that would prevent this claimant from performing physical exertional activities of a moderate nature as described. The MRI of his thoracic spine did show some mild spondylosis, but there was no evidence of disk disease or other abnormalities. The exam by his orthopedic surgeon in June 2012 showed tenderness to palpation of the paraspinal muscles, but no neurologic or other abnormalities. His last exam by a physical therapist on September 5, 2012 describes improvement in the claimant's range of motion as well as his pain level at rest and with activity. His discharge from physical therapy confirms his clinical improvement.

(*Id.*).

Liberty also requested an Occupational Analysis from Senior Vocational Case Manager Bernadette Cox (hereinafter "Cox"). (AR 135-138). Because the Dictionary of Occupational Titles did not include a description for Special Assets Manager, Cox consulted the Occupational Information Network, Occupational Outlook Handbook and various Internet job postings to determine the duties involved. (AR 136). The closest match, Financial Manager, Branch or Department, "appears to be performed in both the sedentary and light work classification, with ample opportunities at both physical demand levels." (AR 137). Based on her research, Cox concluded as follows:

> With a reasonable degree of vocational certainty, the typical physical demands of Mr. Schultz's occupation of Financial Manager, Branch or Department are most often performed in two manners, sedentary and light physical demand category in the national economy. Some Financial Manager, Branch or Department primarily manage personnel, authorize loans, coordinate services, generate various reports and monitor the

9

functioning of the branch which is performed at the sedentary level of physical demand level. Other Financial Manager, Branch or Department are also responsible for generating new business accounts which involves visiting customers primarily business to business, other bank branches, attending meetings, evaluating (property) assets which is performed in the light physical demand level. Ample opportunities exist at both physical demand levels.

(AR 138).

On September 27, 2012, Liberty notified Schultz that it had denied his claim for LTD benefits. (AR 139-142). Liberty relied upon Schultz's medical records, Dr. Sherman's review and Cox's occupational analysis in concluding that Schultz did not meet the LTD Plan's definition of disability. (AR 140-141). The determination letter also informed Schultz that he could submit a written request for review of this decision, as well as additional evidence in support of his claim for LTD benefits, within 180 days of receipt of the letter. (AR 142).

Schultz returned to work on November 1, 2012. (AR 165). That same week, he requested and received copies of his claim file from Liberty. (AR 161-163). He then submitted a written request for review of this decision at the end of the allotted 180 day time period. (AR 164-168). In his appeal, Schultz argued that he was unable to perform the material and substantial duties of his occupation. (*Id.*). He further asserted that Liberty's review of his claim was arbitrary and capricious because it failed to consider significant portions of his medical records. (*Id.*). While Schultz failed to submit any more medical evidence, Schultz he attached a job description for Special Assets Manager at Dacotah Bank, noting that Cox did not find an exact match for his post. (AR 169-170). Because this particular SA position required moving objects weighing up to 25 pounds, sitting at least half of the work day, standing as much as 40% of the work day and walking

about 10% of the work day, Schultz argues that his occupation is performed at the moderate physical demand level in the national economy. (AR 170).

About one month later, Liberty notified Schultz that it was upholding its decision. (AR 174-179). Liberty provided the following explanation for its decision:

> Our role in reviewing Mr. Schultz's file is to determine whether his medical condition and the medical documentation contained in his file validates impairment, which would preclude him from performing the material and essential duties of his own occupation throughout the elimination period April 23, 2012 to July 22, 2012 and forward; and that he meet any other applicable Plan provisions. After thorough evaluation of his claim, including all new evidence submitted for review, we have determined that the records on file do not support that his medical condition was of a nature and severity that would warrant restrictions or limitations which would preclude him from performing the material and essential duties of his occupation throughout the period of time under review and he did not satisfy the Plan requirements as he failed to comply with his physician's treatment plan for him.

(AR 178). Having exhausted his administrative remedies, Schultz filed this action on August 27, 2013. (Doc. # 1).[3]

## III. Analysis

### A. Standard of review

Federal courts review a plan administrator's denial of benefits *de novo*, "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). When a plan administrator has such discretionary authority, this Court reviews a decision to deny benefits under "'the highly deferential arbitrary and capricious

---

3 The Complaint originally named both Liberty and the LTD Plan as Defendants. (Doc. # 1). Schultz withdrew his claims against Liberty upon filing of his Amended Complaint (Doc. # 6-1). Thus, the LTD Plan is the only remaining Defendant in this action.

standard of review.'" *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168-69 (6th Cir. 2003) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996)).

In this case, the LTD Plan gives the Plan Administrator "exclusive discretionary authority to determine eligibility for benefits under the Plan, to construe the terms of the Plan and to determine any question which may arise in connection with its operation or administration, except to the extent that the Plan Administrator has authorized the claims administrator to make such determination." (Doc. # 20-3 at 17). This language explicitly grants the Plan Administrator discretionary authority, thus subjecting this decision to the arbitrary and capricious standard of review. Both parties seem to concur with this assessment, as the briefing reflects no disagreement over the standard of review. Therefore, the sole issue before this Court is whether Liberty's decision to deny Schultz's claim for LTD benefits was arbitrary and capricious.

### B. Liberty's decision to deny Schultz's claim for LTD benefits was arbitrary and capricious

The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). When applying this standard, "the Court must decide whether the plan administrator's decision was 'rational in light of the plan's provisions.'" *Id.* (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)). The Court may not "substitute its judgment for that of the administrator," nor may it act as a mere rubber stamp on the administrator's decision. *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, 625 (6th Cir. 2007) (Boggs, C.J., concurring); *Glen v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006). Rather, the Court must "review the

quantity and quality of the medical evidence and the opinions on both sides of the issues."

*Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). If "it is possible to offer

a reasoned explanation, based on the evidence, for a particular outcome," the Court must

conclude that the outcome is not arbitrary or capricious. *Id.* (internal quotations omitted).

### 1. Liberty failed to perform a "full and fair review" of Schultz's claim

Employee benefit plans must "afford a reasonable opportunity to any participant

whose claim for benefits has been denied for a full and fair review by the appropriate

named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). In order "to

provide claimants with a reasonable opportunity for a full and fair review of a claim and

adverse benefit determination," claims procedures must incorporate the requirements set

out in the Code of Federal Regulations. *See* 29 C.F.R. § 2560.503-1(h)(4).

### a. Components of "full and fair review"

### i. Consultation with healthcare professionals

"The claims procedures of a plan will not be deemed to provide a claimant with a

reasonable opportunity for a full and fair review of a claim and adverse benefit

determination unless the claims procedures" provide as follows:

> . . . . [I]n deciding an appeal of any adverse benefit determination that is
> based in whole or in part on a medical judgment, including determinations
> with regard to whether a particular treatment, drug, or other item is
> experimental, investigational, or not medically necessary or appropriate, the
> appropriate named fiduciary shall consult with a health care professional who
> has appropriate training and experience in the field of medicine involved in
> the medical judgment.

*See* 29 C.F.R. § 2560.503-1(h)(3)(iii). Furthermore, the claims procedures must ensure

that:

> . . . . [T]he healthcare professional engaged for purposes of a consultation under paragraph (h)(3)(iii) of this section shall be an individual *who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual*.

*See* 29 C.F.R. § 2560.503-1(h)(3)(v)(emphasis added).

Admittedly, "the plain meaning of the regulation's text does not clearly indicate whether *all* physicians consulted during the appeal process must be new physicians, or whether at least one new physician will suffice." *Wintermute v. The Guardian*, 524 F. Supp. 2d 954, 963 (S.D Ohio Nov. 27, 2007). Although there are relatively few opinions addressing this precise issue, those courts that have had occasion to interpret 29 C.F.R. § 2560.503-1(h)(3)(v) have consistently found that one new physician is sufficient. *See id.* (finding no error in the administrator's reliance on two physicians during the initial and appellate reviews because two new physicians were also consulted on appeal); *Pitts v. Prudential Ins. Co. of* Am., 534 F. Supp. 2d 779, 790-91 (S.D. Ohio 2008)(concluding that the claimant did not receive a full and fair review because Prudential "reached each of its decisions relying upon the opinion of Dr. Gerson"); *Kaiser v. Standard Ins. Co.*, No. C-05-4284-SC, 2007 WL 120836 at *5-6 (N.D. Cal. Jan. 11, 2007)(stating that review by one new physician is sufficient to comply with 29 C.F.R. § 2560.503-1(h)(3)(v)); *Chatterton v. IHC Health Plans, Inc.*, No. 2:05-cv-130-TC, 2006 WL 1073466 at *15 (Dist. Utah Apr. 20, 2006)(deciding that the administrator substantially complied with the regulation, even though one physician was consulted on both levels of review, because new physicians were also involved in the appeal).

In its letter upholding the adverse benefit determination, Liberty leans heavily on Dr. Sherman's interpretation of the medical records, as well as his conversations with Dr.

Redden and Dr. Kakarlapudi. (AR 174-179). Schultz argues that Liberty should have consulted another health care professional on appeal because it relied upon Dr. Sherman's medical judgment in rendering its initial decision. Because the record makes no mention of a health care professional who was not involved in the adverse benefit determination, Schultz concludes that Liberty failed to give him a full and fair review.

Liberty's response is conclusory at best. While Liberty contends that "nothing in ERISA or the governing law requires Liberty to conduct any medical review of Plaintiff's claim, let alone a second medical review, particularly when there is no additional medical information provided," the Regulations do not support this argument. (Doc. # 24 at 41). As explained above, courts have read the Regulations as requiring plan administrators to consult a separate health care professional on appeal if the adverse benefits determination was based in whole or in part on a medical judgment. *See* 29 C.F.R. § 2560.503-1(h)(3)(iii)-(v); *Wintermute*, 524 F. Supp. 2d at 963; *Pitts*, 534 F. Supp. 2d at 790-91. This obligation exists regardless of whether the claimant submits additional medical evidence on appeal. *Id.*

In this case, Liberty based its adverse benefits determination, at least in part, on Dr. Sherman's determination that "[t]he medical documentation as a whole does not demonstrate a physical impairment that would prevent this claimant from performing physical exertional activities of a moderate nature as described. The MRI of his thoracic spine did show some mild spondylosis, but there was no evidence of disk disease or other abnormalities." (AR 133). This determination constitutes a medical judgment, and therefore, triggers Liberty's obligation to consult another health care professional on appeal.

Liberty then argues that it did not have to consult another health care professional because Schultz's own physicians concurred with Dr. Sherman's impressions. While it is true that Dr. Redden and Dr. Kakarlapudi agreed with Dr. Sherman's review of the medical evidence, this does not relieve Liberty of its obligations under the Regulations. At no point do the Regulations state that a separate consultation on appeal is unnecessary if all health care professionals involved in the adverse benefit determination concur. Simply stated, Liberty is not prohibited from considering some of the same evidence at both levels of review, but neither is it excused from seeking an opinion on appeal from at least one health care professional who *was not* involved in the initial determination. *See Wintermute*, 524 F. Supp. 2d at 963.

Finally, Liberty attempts to cure the defect in its claims procedures by pointing out that the appeals decision was also based upon Schultz's failure to comply with treatment plans. After all, *Wintermute* indicates that a claimant's failure "to stay under a doctor's regular care for the cause of her disability . . . . would also independently allow a cessation of benefits." 524 F. Supp. 2d at 962. Because the LTD Plan explicitly states that benefits may not be awarded if the claimant fails to take advantage of available treatment, Liberty argues that Schultz's failure to appear at appointments, complete his first round of physical therapy and consistently comply with his HEP "*singularly* precludes him from prevailing on his claim for benefits." (Doc. # 24 at 29).

While there is evidence in the record to suggest that Schultz failed to comply with his treatment plan, Liberty cannot excuse its own error simply by drawing the Court's attention to Plaintiff's mistakes. (AR 93, 100, 133). In *Wintermute*, the court granted the defendant's motion for judgment on the administrative record after also finding that "[t]here

16

were no procedural defects in [the plan administrator's] initial or appellate denial of [claimant's] benefits." 524 F. Supp. 2d at 963. Thus, *Wintermute* did not address the situation currently before this Court: What happens when both the claimant and the plan administrator fail to comply with all components of the LTD Plan? Given the scarcity of case law on this issue, the Court is simply unwilling to conclude that one party's error was more grave than the other. The fact remains that Liberty failed to consult with another health care professional on appeal. Therefore, the Court finds that Schultz did not receive a full and fair review of his claim.[4]

Having pointed to a defect in Liberty's claims procedures, the Court could proceed directly to its discussion of remedies. In cases such as these, courts often remand the claim to the plan administrator and direct them to conduct a full and fair review. *See Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009)(internal quotations omitted). Because Schultz has attacked other aspects of Liberty's claims procedures, the Court will consider some of the remaining arguments so that it may give Liberty adequate guidance on remand.

### ii. Consideration of additional evidence

Under the Regulations, claims procedures must also:

---

[4] Liberty has essentially set forth two bases for their adverse determination: (1) Schultz did not establish that he was disabled, as that term is defined in the LTD Plan; and (2) Schultz did not comply with his treatment plan, as required by the LTD Plan. For the sake of clarity, the Court notes that Liberty's failure to consult with another health care professional on appeal is not a moot point simply because Liberty had a separate basis, unrelated to the disability determination, for the adverse decision. The language of the Regulations suggests that the initial consultant's opinion need not be the *sole* basis for the initial determination in order to trigger the second opinion obligation on review. *See* 29 C.F.R. § 2560.503-1(h)(3)(iii) (stating that a second health care professional must be consulted if the "adverse benefit determination is based *in whole or in part* on a medical judgment")(emphasis added).

> [P]rovide claimants the opportunity to submit written comments, documents, records and other information relating to the claim for benefits

> [P]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination

*See* 29 C.F.R. § 2560.503-1(h)(2)(ii)-(iv).

When Schultz submitted his written request for review of the adverse disability determination, he also included an SA job posting from Decotah Bank. (AR 165-170). This particular position required moving objects weighing up to 25 pounds, sitting at least half of the work day, standing as much as 40% of the work day and walking about 10% of the work day. Noting that these physical requirements were more rigorous than Cox reported in her occupational analysis, Schultz argued on appeal that the "occupational analysis incorrectly defines his position in the national economy." (AR 166-167). However, "[a]fter thorough evaluation of his claim, including all new information submitted for review, [Liberty] determined that the records on file do not support that his medical condition. . . would preclude him from performing the material and essential duties of his occupation . . ." (AR 178).

Schultz now argues that Liberty did not consider the Decotah Bank job, as one of its claims notes states "no additional records provided for review." (AR 1). Schultz reads too much into this claim note. From the Court's perspective, this note simply indicates that no more *medical* records were provided for review. This interpretation is consistent with Liberty's letter upholding its initial determination, which states as follows: "On March 29, 2013, we received your letter of appeal request on behalf of Mr. Schultz, along with an internet job listing for a Special Assets Manager. No further medical records or statements

18

from Mr. Schultz's physicians were received." (AR 177). Moreover, the letter states that Liberty considered "all new information submitted for review." (*Id.*). Because the Decotah Bank job posting was the *only* piece of evidence submitted after Liberty's initial determination, it follows that Liberty must have considered it. Schultz cannot convince this Court to draw the contrary conclusion simply because the posting failed to influence Liberty's decision.

### iii.    No deference to initial determination

The Regulations further require that claims procedures:

> [P]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual;

*See* 29 C.F.R. § 2560.503-1(h)(3)(ii).

According to Liberty, it decided to uphold its initial determination for two reasons: (1) "the records on file do not support that [Schultz's] medical condition was of a nature and severity that would warrant restrictions or limitations which would preclude him from performing the material and essential duties of his occupation throughout the period of time under review;" and (2) Schultz "did not satisfy the Plan requirements as he failed to comply with his physician's treatment plan for him." (AR 172-179). In support of this proposition, Liberty cites to Schultz's physical therapy notes, appointments with Dr. Redden and Dr. Kakarlapudi, Dr. Sherman's review, x-rays, MRIs and Cox's analysis. (*Id.*).

While this explanation suggests that Liberty conducted an independent review of the adverse benefit determination, Schultz nevertheless contends that the appeals decision afforded inappropriate deference to the adverse benefit determination, first pointing out that

"the administrative record is devoid of any information demonstrating any analysis whatsoever of Mr. Schultz's claim for benefits on appeal." (Doc. # 23 at 14). From the Court's view, the letter *is* proof of the analysis on appeal, as it details the evidence considered on appeal and explains why Liberty decided to uphold the adverse benefit determination. Schultz then complains that Liberty relied upon much of the same evidence in upholding its initial determination. Although the Regulations require consultation with a separate health care professional on appeal, as the Court has already explained, they do not preclude Liberty from considering some of the same evidence at both the initial determination and appeal stages. Such a policy would be particularly untenable in cases such as this one, where so little additional evidence was submitted on appeal. Accordingly, the Court finds that the appeals unit did not afford inappropriate deference to the initial determination.

Finally, Schultz insinuates that his initial claim manager, Gwen Campbell, retained some influence over the appeal simply because she received it. However, there is no evidence that Campbell had any further involvement in Schultz's appeal. The record indicates that Campbell promptly referred Schultz's appeal to the appeals unit. (AR 172). Appeal Review Consultant Stephanie Berry then reviewed Schultz's claim and issued the letter upholding Liberty's initial determination. (AR 172-179). Based on this record, the Court is confident that Schultz's claim was reviewed by "an appropriate named fiduciary of the plan, who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual."

### b.    Remedies for failure to provide "full and fair review"

Having found that Liberty failed to provide a full and fair review of Schultz's claim,

the Court "may either award benefits to the claimant or remand to the plan administrator." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). "[W]here the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled, remand to the plan administrator is the appropriate remedy." *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009)(internal quotations omitted).

In this case, the claims procedures were deficient because Liberty relied upon Dr. Sherman's opinion, as well as his conversations with Dr. Redden and Dr. Kakarlapudi, at both the initial determination and appeals stage, without consulting a separate health care professional. This certainly qualifies as a defect in the integrity of the decision-making process, suggesting that remand is the appropriate remedy. Moreover, the Court simply cannot conclude that Schultz is *clearly entitled* to benefits at this juncture. Because the treatment notes are somewhat equivocal, and Schultz's attendance rate spotty at best, there simply is not enough evidence in the record to support an outright award of benefits. Accordingly, the Court will remand Schultz's claim to the plan administrator, with instructions to conduct a full and fair review.

### 2. The Court will not address Liberty's reliance on Dr. Sherman's opinion or Cox's occupational analysis

In addition to attacking Liberty's review process, Schultz argues that the decision to deny his claim for LTD benefits is arbitrary and capricious for two other reasons: (1) Liberty improperly relied on Dr. Sherman's opinion because he never examined Schultz; and (2) Liberty's decision was based, in part, upon an incorrect occupational analysis. These arguments pertain to Liberty's substantive review, rather than procedural defects in the

review process. Because the Court has already determined that remand is necessary to address the defects in Liberty's review process, it need not consider these issues.

### IV. Conclusion

Accordingly, for reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Plaintiff's Motion for Judgment on the Administrative Record (Doc. # 23) is **granted**;

(2)    Defendant's Motion for Judgment on the Administrative Record (Doc. # 22) is **denied**;

(3)    This matter be, and hereby is, **remanded** to Defendant for reconsideration of Plaintiff's claim for long-term disability benefits in accordance with this Order; and

(4)    Plaintiff's Complaint be, and hereby is, **dismissed without prejudice** and **stricken** from the Court's active docket.

This 6th day of November, 2014



Signed By:
*David L. Bunning*
United States District Judge

G:\DATA\Opinions\Covington\2013\13-156 ERISA MOO.wpd